The next case, call for oral argument, Shelby County State Bank v. Harris. Counsel? May it please the court, my name is George Ripley and I'm here for a second time for this case representing the state of Harris. And for the purposes of clarification, I'll defer a little bit to that. It's hard to analyze this case without realizing the central role that Franklin Dove played in this matter and the three-way conflict he had both representing the buyer and seller of the business which is involved here and also being a major stockholder, a lawyer for the bank, an officer of the bank, and a member of its loan committee. Now, as we analyze this, there are several dates that we need to keep in mind. The first one is May of 1994. This is when the guarantee that the suit was signed by Mr. Harris. It's always interesting to recall that this would be, in our prior case, the alleged negligence on the problem of the representation here because Mr. Dove did not tell Mr. Harris to renounce this at a time when there was a sale of the business. And this ends up going back to that failure of that agreement with the bank in this particular case. The other date is 10-94. That's the date of the sale of the business. And here is the sum, again, represented by everybody involved with Mr. Dove who has all these various connections to the bank. The next date we need to look at is June 12, 1996. And this date is the default date on the sale of the contract between Mr. Harris and his son, directed by Mr. Dove, and which the bank was also the operator. According to the terms of the contract, there is no longer a right to manage, operate, or hold shares of the stock if the buyer ever became in default. And that's the first time we say that this case against Mr. Harris should fail because at that point in time, after that point in time, the loans which were sued upon in this case were entered into by the bank through the corporation. The notes that were sued upon were all issued with the sign, NO AGREEMENT. Undisputed that once the default began, June 12, 1996, the buyer never had the right to operate this business and hold the stock and manage it. Was the bank aware of that? The bank was the escrow agent. Mr. Dove, who drafted the agreement, was an officer, a director of the bank, on the loan committee, and put it, how could they not know it? Does the record show that they had knowledge? We can't speculate. The record shows that they had the agreement because they were the escrow agent. I understand the agreement. And they knew that it was in default because it wasn't coming in. They weren't sending it on. It's about as close to knowledge as you can have. If the payments were supposed to go to the bank as the escrow agent and the payments stopped, and the bank has a copy of the sales contract that provides that you can't hold shares of stock and you can't manage the company if he's in default, they have knowledge. And they certainly have the ability to have the knowledge, but they have to have the knowledge because they're not sending anything forward. When they don't send anything forward, they've got the contract that's been drafted by one of their officers at the bank. I think they're in charge of knowledge of that default. Well, they know it's in default, but they're not sending anything forward. Did they send out a default notice? They didn't send out a default notice, but they didn't send any payments to Mr. Harris either. And they're supposed to get those payments in, and they're supposed to send those payments on. And when the payments stop coming in, they know that. They're the collection agent, if you will. They're the transferee between the buyer and the seller. When it stops coming in, they know it, and they have the contract right there, drafted by an officer at the bank. How can they not be charged with that notice? But it gets worse because the next date we have is 5-1-0-2. And that's the dissolution of the corporation by the Secretary of State. And the notes that are being sued upon are made to the corporation at the time when there is no corporation. So you know my question is, is it in the record that the bank knew that the corporation was dissolved? I don't believe it's necessary for the bank to have actual knowledge. You presumably know what is out there. The banks, and maybe that's why we've got in front of a lot of our banks. They're making loans without exercising due diligence. Would you loan money to a bank, I mean to a corporation, signed by the corporation, without checking whether or not the corporation still exists? It's such a simple fact. You go to the Secretary of State's website, you type in the name of the corporation, and it tells you whether or not they're a good standard. Or you walk across the street, like in this situation, you go to the courthouse, the court of redeems, and find out, see if there's a dissolution that's required against this corporation. And in fact, in this case, there was a certificate of dissolution filed in the county clerk's office. Exactly right. Prior to the loans. It was on file before any of these notes were made. And I don't believe when you're talking about holding someone liable who I guarantee, which is nine years old, which was taken out for the purpose of taking a loan to buy a truck. You're going to try and make someone who else liable for the debts of the corporation. I think the bank owes some due diligence on these circumstances. Not only that, but look into the record of this case, and you'll discover this corporation has been having all kinds of financial problems all the way along. That's part of the reason why the major notes were renewed multiple times with extensions of due dates, changes in interest rates, changes in payments. This was not a surprise to the bank that this company was not profitable. It was not a surprise to the bank that this was a company having problems. You would think under those circumstances that a reasonable bank would look into the fact to see if this company was even still alive, still a corporation. But no, they didn't do that because they had this guarantee sitting back there so they could always go back and hold somebody else liable. And that's what they did, that's what they tried to do in these circumstances. I don't believe – I believe there's an obligation on both sides, particularly when you're trying to hold somebody liable for a debt that's not even their own, that you exercise some due diligence under the burden of this and see what is there to be seen. That's part of the reason why we filed two counts of consumer fraud in this case which were dismissed by the court. We filed count one, alleged consumer fraud, which we believe should not have been dismissed, because the bank made loans to a dissolved corporation when they had at least instructed that the corporation was dissolved and then tried to take – cover up their error, which they could have easily discovered in an archive, who had no knowledge of what was going on at all. In the discovery in this case, our client tried to get information, and we alleged that in our complaint, about the financial situation of the corporation, which the bank had, and they refused to give that information to Mr. Harris when he requested it. Well, isn't this a private wrong, not a general public wrong, such that the Consumer Fraud Act would not – Well, I don't think the Consumer Fraud Act is directed strictly at public wrongs. It's directed at private wrongs as well. If you as an individual are being frauded by a company, I believe that you have a cause of action, and it doesn't matter whether it be a class action for the good of the public, but it's not required. I don't think that's what Crothis says from this court. I believe that's incorrect. I think I've seen plenty of individual cases of consumer fraud being brought by individuals against banks and car dealerships and everything else. It is an issue of a problem. It has to be the kind of problem which could affect the public at large, I think. But I don't think a particular situation has to affect the public at large. Certainly, if a bank has a policy of making loans without checking whether or not the perpetrators are still in existence and exercising that due diligence, which you would expect them to do when you have people who are obligated to pay for your mistake, to pay to guarantee those loans, I think there's an obligation on the bank to take those people's concerns into consideration. You can't just make loans willy-nilly to a bad risk just because you've got someone with money who's guaranteeing the loan, at least without bringing them into the process. And, of course, that's what the bank did here. They just kept making these loans to a company that was going down the toilet. And because they had Mr. Harris as a guarantor, I don't believe that's the kind of thing, but I think that's the kind of thing that the people who brought that were going to protect the public, including Mr. Harris, was part of that public. When we talk about loan guarantees, we're not talking about something that's sui generis. It's a single event that happens in a bank situation. That's something that happens on a regular basis. I don't think we want to have our banks going forward with bad loans just because they've got somebody stuck who has money on a guarantee. That's not the purpose of it. And it shouldn't be the purpose of it. The other part of our, the count three of our case was that they made loans when there was no authority of the buyer to go to the stock of the corporation. Again, I think the bank, again, is the most powerful part of the transaction, should have some obligation to know whether or not they're making a loan to a real entity. Again, if they don't want to do that and they don't want to hold the corporation liable, okay, maybe that's fine. But when you've got guarantors out there, there has to be some obligation to that guarantor that you are going to act responsibly as a lender and not lend money to a corporation that doesn't exist and then come back and say, oh, well, let's, we got you out here, you pay for it. There is some obligation, there should be some obligation to the product for them to do that. Finally, I would like to ask a question. On these particular loans, did the bank require any type of corporate resolution authorizing the loan? Not that I've seen. Signed by anybody? Not that I've seen. So nothing was required at all? The son signed them as president. There were no resolutions that I saw in there. Okay, so it's not a matter of they asked for one and the son just signed it as if everything was okay. They just didn't require one. He signed the note and that was about it. There was no proof required of his continued corporate existence at the corporation. There were no resolutions required to be filed. Most of the small loans were due loans. Basically, they were for payroll, most of them, for payroll and to keep trucks operating because the company was in such bad shape. In fact, we knew the company was in that bad shape. And just to ask another question, these were not renewals of older loans? One was a renewal. We're saying it was an ovation under the circumstances because it changed terms. It changed the due dates, it changed the payment size, it changed interest rates. So one of them predated 03? There was a continuation or renewal of the prior loan. I think that particular loan was renewed four or five times over the course of the situation. But that one, I believe that one was one on 425 of 03. They were also completely new, and the next note is on 3703, 528 of 03, and 8203. All of these were signed by Harris as president of the corporation? That's correct. Including after the date of dissolution? That's correct. And these are just the ones that were sued upon. There were multiple renewals and multiple different loans. Some paid off, some rolled into others. But after the corporation was dissolved and also after he was in default, there were just a complete long series of transactions. The major note, I believe, was probably there was an ovation. Renewed at least four times during the course of the operation, after the sale and before the final judgment in this case. In general, that was because of either non-payment or slow payment. There were all these warning signs out there to the bank, none of which were transmitted to Mr. Harris. He was not informed of anything on this until his lawyer, Mr. Dove, sued him to the bank on this transaction. And that's when things got going. That's when he knew, well, he knew it was gone before that date because the company was dead. And, of course, he had some knowledge that it probably wasn't doing well to stop receiving payments, although that's not necessarily a sign that business is going on. It's a sign you're not getting payments. It certainly would be, to most people, a signal. There's no question about that. You have to concede that. But how bad the situation was, that was never communicated. And there was also discussions with the bank about the guarantee. And Mr. Harris said that he believed that the guarantee was no longer effective. There's no bank records of that. He told them that he thought it was stale, it was over, it was done, that it was for buying trucks, although it was a general and unlimited guarantee. Certainly he could be wrong about that. But it's going back to 1994, and now here we are trying to enforce it. Is it correct that Gerald Harris signed only one guarantee, but the son had to sign it? Mr. Harris signed one guarantee that was in 525 of 94 when he still owned all the stock of the business, and they bought some new trucks. And when they bought the new trucks, there was a note issued, and I think that note was paid off someplace along the line. He signed that guarantee at that time. I believe his son signed a new, if I recall from the record, his son signed a new general guarantee every time the large note wasn't renewed or reissued. And this wasn't just a renewal. When you see the documents, they are complete new documents. It's not just little things that are renewings. That's why we believe that there's an ovation, and why we believe one after all three is valid as far as the guarantee to Mr. Harris. So although Mr. Harris was at the bank and told them that guarantee is no good anymore, et cetera, he never served them with a written notice that he was renouncing the guarantee and therein lies the problem for Mr. Harris. The original problem was keeping it going when his lawyer betrayed him, and it was also the bank. The stockbroker should have told him to renounce it long ago so he wouldn't find himself in that position. Also, that was part of the problem with the real estate. We had all the problems with real estate and the improper credit for the value of the real estate. At the time of the sale, Mr. Harris individually owned the real estate because it was on the corporation and not owned the real estate. On advice of counsel, he transferred that real estate to the corporation at the time of the sale. Counsel did not recommend or prepare any kind of security agreement for him for making that transfer. Of course, at that point, then, when the loans go sour, the bank sues the corporation, which they couldn't resolve because it would be on the real estate, and seized the real estate. Then they put the real estate up for public sale, buying it for $20,000 and selling it for $75,000, only trying to give them credit for $20,000. And that's another issue that we had in this situation that we're here at across Appalachia. And we believe that the bank's excuse for not giving them credit was that they deserved to make a reasonable profit. I think the law says the bank is entitled to take up the whole, not make a reasonable profit, when it comes to gathering the asset necessary to pay a judgment. If you gather an asset, we believe our client is entitled under the law, under the QCC, to give credit for the value of that asset, particularly where it's sold or bought in, if you will, by the seller. In fact, what you have is an auction where you put your property up for sale and you don't like the price, so you bid it in. You've never really lost a property. No one's ever lost a property. You just said, you do it, and sell it at private sales as opposed to auction. Here, the bank did not give them credit for the difference between the public sale price when they bought it at $20,000 and the private sale price shortly thereafter of $75,000. There was an issue, and there's an issue here as to whether or not there has to be a pleading to settle on. And I believe we've dealt with that issue. Of course, that's a fairly good case law on that as well. But in the circumstances that we have here, we don't look at a solution to settle on. It's a failure to prove damages. You have to be able to, we weren't given credit for what we were supposed to be given credit for, and they got the land, and we're entitled to be given credit for the value of that land against it. I believe that if we're not, the judge agreed with us, and I believe that part of the judgment should be sustained, if any of it is sustained in those circumstances. Thank you, counsel. Counsel? Thank you. May it please the Court. My name's Fred Erikson. I'm a lawyer from Decatur. I've been in this case now with Mr. Ripplinger for four and a half years, and even if you don't agree with what somebody does or don't especially like him, you can admire an approach that he takes which has an effect on you. And the approach he takes that seems to have an effect on me, I call it kind of a roll-and-go approach, raises all these issues and makes all these accusations against Mr. Dogwap, a friend of mine, and I have this tendency to launch off into flailing and arguing and shouting and defending and straightening out his misrepresentations of the record, and I lose track of what I'm doing, what I'm here to do. By God, I'm not going to do it this time. This case involves a guarantee, a signed document. It was signed by both parties. Nobody disputes the validity of the guarantee. Nobody disputes any word in the guarantee. Nobody claims advantage was taken of somebody when the guarantee was signed. It is a document that controls all aspects of this case, and it is a very plain and specific document. It covers almost everything that Mr. Riblinger has said. Any of these questions that he's brought up are covered by the guarantee. And, of course, what does a good lawyer do when he's in that situation? Well, he wants to argue about everything else. He wants to argue about, I mean, if they file a lawsuit as originally filed, claim that the dissolution of the corporation happened before the guarantee was even signed. Mr. Dove has got nothing to do with the case in its present posture. He sued Mr. Dove, lost. Now we're in here retrying Mr. Dove and getting way outside the record in terms of representations by counsel. I believe that Mr. Harris' deposition is in the record of this case, and Mr. Harris said Mr. Dove had nothing whatever to do with the signing of this guarantee, didn't recommend it, was not involved in it. Well, the case against Mr. Dove has already been up here. It's over. I wrote the opinion, as I recall. I don't know if there's a rule 23, but the legal malpractice case went out on statute of repose, as I recall. I think that's right. But it's over. Your Honor, you're correct. It's over. In any event, Mr. Harris also in his testimony said in his deposition he went to Mr. Dove to prepare this agreement with his son, and Mr. Dove did exactly what he wanted him to do. But see, I'm falling into the Robidog thing. Am I arguing it again? And I shouldn't. What I want you to do, and I hope you'll do, is look at this guarantee when you're trying to decide virtually every issue that is going to be before you. The guarantee is set out in the appendix to the appellant's brief. It's at page 24 and page 25. And I'm going to just go over some of the things that are in this. And, again, there's no dispute about the validity or the application of this guarantee. Nobody has attacked it. Nobody has claimed it's inoperable in any respect. This case doesn't come before you in some kind of a legal vacuum where we're just going to have a general discussion about guarantees and what banks, quote, ought to do. This comes before you in the context of this guarantee. And if you go down the list of it, I'm not going to stand here and read it all, but the guarantee in paragraph 2 says it's an unconditional guarantee of the corporation's debt to the bank. It's unlimited. The guarantor will pay all interest and all lenders' costs in enforcing the guarantee, including all modifications. Going to be responsible for modifications. The guarantor waives virtually all the things that counsel here has complained about. In paragraph 3, it's absolute and continuing. Not affected if the bank amends, modifies. It's not affected in number 3. Not affected by termination or dissolution. Number 3, or number 4. That paragraph doesn't necessarily say it's okay to loan them more money after the dissolution. It's unaffected if they're dissolved after the loans. Actually, there's a real interesting thing about that. The corporation was dissolved here in May of 2002. There are four notes that were sued on. One of the notes was the big note was signed before this dissolution. And the judgment itself takes a kind of a close reading of a complicated and not very interesting case, if you're not in it, to pick up on this. But there is an exhibit that was admitted in evidence. It's plaintiff's exhibit W. Plaintiff's exhibit W and a testimony of the bank's officer is to the effect that there were loans made after the dissolution. The affidavit on file of the bank's officer says he had no notice, no knowledge, whatever, that the corporation had been dissolved. And that the son of Mr. Harris continued to operate the corporation exactly as he always had. So the bank doesn't know about the dissolution. There's not a bit of evidence that the bank notified. But what happened was that when the lawsuit got filed and the various collateral was taken and applied on debt, and eventually the corporation itself was sued because it didn't ever go into bankruptcy, but it did have some assets. When the corporation was sued and its assets were executed upon, the receipts of those assets were applied on the loans that were made after the corporate dissolution. Now, I don't think that corporate dissolution has any effect on the circumstances of this case. But the fact is, without any objection, without any question, exhibit W and a testimony of the bank officer shows that it was the loan. And the judgment is based completely on the loan that was made before the corporation was dissolved. Let me make sure I'm hearing you right. All loans that were made after the dissolution of the corporation were paid from the sale of assets. Right. Okay. And the bank, in the guarantee, had a right to apply anything received from the corporation in any order it chose to do. So, now, what counsel is going to say, I'm going to anticipate it a little bit. He's going to say, well, this loan was made here before dissolution. The loan that was made before dissolution, that was modified. The guy, the borrower, missed a payment. And so they modified it only to the extent, they didn't extend the amount, they didn't give him any more money. They just, since he missed part of the payment, they allowed him to make that payment at the time that the final balloon payment was due. That was the modification. But if we really want to argue at that level, I got an answer for him. If the corporation was absolutely unable to act, if everything it did after dissolution was void, how can the modifications actually modify the loan that was made before the corporation was dissolved? If the modification, if the corporation was totally unable to operate, then the modifications would have been inadequate. There's probably some answer to that that has something to do with Mr. Dove. But the fact is, again, going through this, I wanted to back up to the, keep going through this guarantee. The guarantee is in paragraph four, direct and unconditional, and there's essentially waivers of all of the arguments that are advanced by counsel about the bank having to do this or do that in order to lose its place as the owner of the guarantor. And all of these things are waived. All notices are waived in paragraph five. In paragraph ten, the bank is, it just flatly says the bank's not required to furnish the guarantor with financial records of the corporation. It says right in the guarantee, the guarantor assumes full responsibility for obtaining any additional information regarding borrower's financial condition, and lenders shall not be required to furnish the guarantor with any information of any kind regarding borrower's financial condition. All through this brief and these arguments, it's, well, the bank wouldn't give him information about his son, and the bank, if you read the record, the bank said we couldn't do it without the son authorizing it. But the contract controls that. In terms of, I've told you, application of payments, that's paragraph 13. In turn, the argument is that somehow the bank did something or Junior did something that caused this guarantee to be terminated, and paragraph 15 specifically says there's not going to be any termination without a written release by the bank. Paragraph, there is a way that the guarantor can terminate, and of course, he didn't do those things. He admits he didn't do those things. There is a provision for modification and waiver, and the fact that modification, any modification of the guarantee has to be signed by the lender. That's in paragraph 17. It's not there. Collection costs, the attorney's fees, expenses, and whatever. I think the, we've tried to argue that pretty well in our brief with respect to attorney's fees. These attorney's fees are the broadest language that I know of that's been included in these types of agreements. Finally, there's some argument raised in the brief that the guarantor, Mr. Harris, refused to give some information to the bank, and therefore, that somehow gets him somewhere. And the fact is that in paragraph 24, it says guarantor will provide lender with a current financial statement upon request. So apparently, there's some indication that the bank asked Mr. Harris for some financial information, and he wouldn't give it to him. And that is a direct violation of this contract, but they urged the violation of the guarantee as a reason to get him out of the guarantee, because he wouldn't do what he promised to do, which was give the bank his own information. Now, with respect to the whole argument about the son not making the payments when due to the father, the court, the trial court wrote and spoke about this. The question was, was the contract between the father and the son self-executing? If the son missed two payments, was he absolutely unable to act any further on behalf of the corporation? And I think any reading of this contract between the father and the son would indicate that, no, it's not self-executing. The father doesn't have to treat the contract at an end simply because the son doesn't make payments. And I want to read a little bit from the record. I don't like this going outside. I'm used to going outside the record and just having sort of a free-ranging discussion. I'm going to read this from the record. It's from page C-594. There was a meeting between the bank loan officer and the two harassers, the father and the son. The son's buying a corporation from the father. Right here in 1996, the son goes into default on this contract with his father. In default in the sense that he stops making payments. Now, what's going to happen? Well, attached to the defendant's motion for summary judgment at page C-594 of the record, attached is Defendant's Exhibit No. 2 to their argument with regard to summary judgment, is a document from the bank. And they cited it here today. It said, Mr. Harris, I'm going to read from it. Gerald, that's the father, did not think the guarantee was any good. And his statement that he didn't think the guarantee was any good is argued as well. That must mean this contract is void, or the guarantee is void, despite all the language, the contrary, in the guarantee. But if you keep reading, one more sentence. It says, this is he, Mr. Harris, the defendant, stated he would give the additional collateral, but was not interested in returning to Illinois to help with the business. Now, here we are, a year after the, quote, default, the meeting with the bank. And he understands the situation, and he apparently is given the opportunity, he has the opportunity, he has the right to give notice and take over. He tells the bank, in a meeting with the bank, he's not going to return to Illinois, he doesn't want to take over the business, doesn't want to be involved in it. And further down in the same document, and as I say, this is something they put in evidence, it's talking about why the bank felt like it couldn't make additional large loans to this operation. And on the same page I just referred to, it says, father, unwilling to help out with day-to-day operations of business. So you're going to tell us now, in view of, and the father, of course, at the trial testified, did absolutely nothing to try to take back over the corporation. So the question now is, given that case and that posture, is the bank somehow unable to proceed with its guarantee against the father, given what he signed, given his refusal to take any further part in this operation, this corporation, after what they say is the default, his dad, not mine, his dad, not mine, he's saying that there's been a default and that the son couldn't operate the corporation anymore, despite the fact that he was doing it and despite the fact that the evidence is the father's trying to contact the son to get information from him, from the bank, and so forth. The whole thing is inoperable as of the guy missing a couple of payments, or missing all the payments, doesn't make any difference. The father didn't do what he needed to do to take back over the corporation. Now, I want to jump to, I mean, there really are so many issues in this case. What happened, well, we started the trial in this case, and the court had ruled in our favor on these various claims of consumer fraud and so forth, and all of that, I think, is pretty well documented in the brief. The consumer fraud theory rests on the concept that the bank, knowing Junior Corporation is in default, loans money to the corporation so that it can have a case against old Mr. Harris down in Texas. That's the motivation for the loan to the son. When they know the corporation's dissolved, they want to go down and get Mr. Harris in Texas. Their consumer fraud claims fail if their dissolution of the corporation argument fails. And understand what that means. That argument means you let your corporation be dissolved administratively. Now, that's not like the cases they cite where the corporation went out of business and somebody tried to sue them and take judgment. Administratively, it is dissolved because he's not paid his taxes and filed his franchise tax. So the corporation is dissolved administratively, and there are all kinds of ways to get it started again. Administratively dissolved, the corporation isn't really no longer a corporation. It can file lawsuits and so forth. But their argument is son wants the thing to dissolve administratively, doesn't tell the bank. Bank doesn't know. Affidavit is on file showing that bank doesn't know. And the result of that, and then the son continues to run the corporation just as before, but is able to get out of not only the corporate debt but the guarantee because the bank somehow should have known the corporation operating as it was. It really dissolved. And since the bank went ahead and did business with the son, it's on the bank. The guarantor is able to be released. You get into the trial. We have no notice of this, no idea that this is coming. We've got a witness testifying about selling cars. They challenged us on everything in this case, improper sale and the collapse. So we've got a guy out there testifying about selling trucks, and Mr. Ripplinger says, well, now, you know, if you sell real estate, you get a better price on selling real estate if you sell it privately as opposed to an auction, don't you? And we object. What's this about? This is our witness testifying about selling trucks. We go from there to an argument that the bank should give a credit to the defendant in this case because the bank was the successful bidder at a sheriff's sale whereby some property of the corporation was auctioned off. Now, the bank could have been the bank at the sheriff's sale, and incidentally, Mr. Harris knew that the sale was going on, and he testified so in the case. He's aware of it. He didn't comment. He didn't send anybody to go. There's a sale, a sheriff's sale. Everything is done exactly properly. No question is raised about the procedure, how it was handled, anything like that. Go ahead. Well, yes, except I've got a couple questions. Go ahead and finish your talk. Well, what happened is the bank bought at the sale. It could have been anybody, but the bank bought the property. Now, a year later, the bank sells the property, and they sell it for more than they bought it for. The argument is that they're able to follow this transaction out, not just where the debt against the corporation is satisfied by the sale of its assets, but they're able to see whether the bank makes a profit. Nobody in the world would say if the bank sold it at a loss that the guarantor had to pay more. Nobody in the world would say that if somebody else bought this property and sold it at a gain or a loss that had anything to do with this case. But the argument is, well, the bank bought it, and a year later, we don't know why in the record. A year later, it's sold, and the bank makes a profit, and we're entitled to a credit against the judgment against the guarantor because the bank was the successful bidder at a judicial sheriff's sale and later sold the property for more. Nobody claims the bank defrauded anybody. The sale price was exactly consistent with an appraisal. The court who oversaw the judicial sale said everything was done properly. There's no dispute about that. It's just if there's a sheriff's sale of property and you, as the judgment creditor, buy the property, you now suppose, according to them, and I guess according to Judge Paisley, if you're the successful buyer, you can only lose if you sell for more. But if you sell for less, you don't get any credit. It goes nowhere. I think we've covered that in our brief. I have two questions, Counsel. The first one is you're saying that the bank had no knowledge of the dissolution by the Secretary of State of the Corporation and that it was not under a duty, it was not in a situation where it could be charged with constructive knowledge on the loans made after the date of dissolution. That's your position? C-807 is where the affidavit is. Right. No, I understand that. I'm trying to clarify.  This is not a new law. This is a corporation that's been dealing with it for years. No, I understand that. And so there's a continuous course of business. I understand that. Is it also your position, I want to make sure I understood it from your argument, that the monies advanced by the bank to this corporate entity after the date of the Secretary of State's dissolution were actually paid or had assets credited to it so that money was no longer outstanding? Is that your position? Yes. Plaintiff's Exhibit W, it's all a demonstrative exhibit. Yes, exactly. I don't think that if these loans made after dissolution under the circumstances here where the sun just continued to operate and we had no notice, I don't think the corporation and the guarantor were actually insulated from liability were they to continue to operate the corporation. But as a matter of fact, the answer to the question you just asked me is yes. Okay. Thank you, counsel. Thank you. Counsel, rebuttal, and I'll give you a few extra minutes to judge the circumstances. Only to say that as to the basis for the judge's dismissal of counts one and three of our counterclaim, count one was based upon the fact that there was no written notice to the buyer of default from the seller, therefore he was allowed to continue. That's, in my opinion, a misreading of the contract. The contract provides specifically in paragraph four, the purchaser shall be entitled to the rents, profits of the corporation, if it were the sole owner and shareholder thereof, and shall be entitled to the exclusive management and operation of the corporation, including the bullying of the corporate shares, and all fees of the shareholders of the corporation so long as he is not default. Now, there's no requirement in there for a right that basically tells us that the reason we failed with that count was that there was an issue with it. The only place that requires a right under the terms of the sales contract is if Mr. Harris wanted to repossess the actual shares of stock. And, of course, that would only happen if there was anything worthwhile. He didn't do that. He didn't have to do that. Simply by being in default, he no longer had the power to do so. Okay. Thank you, counsel. We appreciate the brief arguments of counsel. We will take this matter under advisement.